**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ROGER A. CONGRESS,
  Plaintiff,

        v.

MARTIN J. GRUENBERG,
Acting Chairman, Federal Deposit Insurance
Corporation
  Defendant.

**Civil Action No. 19-01453 (CKK)**

**MEMORANDUM OPINION**
(December 1, 2022)

Plaintiff Roger A. Congress filed suit against Defendant Jelena McWilliams,[1] Chairman of the Federal Deposit Insurance Corporation (FDIC) alleging violations of the Rehabilitation Act.  Specifically, Plaintiff brought a Rehabilitation Act failure to accommodate claim, arguing that Defendant denied him the following reasonable accommodations for his disability: a change in assignments; permission to telework; the end of pressure to retire, undergo a Performance Improvement Plan, or other pressure that worsened Plaintiff's disability; and reassignment to a different position.  *See* Compl. ¶ 17; Pl.'s Opp'n at 17–20.  Plaintiff also brought a Rehabilitation Act discrimination claim based on disability as to being persistently assigned work he was unable to perform.  *See* Compl. ¶ 18; Pl.'s Opp'n at 1, 14–17.  Finally, Plaintiff brought a Rehabilitation Act retaliation claim, arguing that Defendant retaliated against him for filing a request for reasonable accommodation by placing him on a Performance Improvement Plan, issuing a Notice of Proposed Suspension, and threatening to fire him and withhold his pension.

---

[1] Martin J. Gruenberg replaced McWilliams since the start of this litigation.

*See* Compl. ¶ 19.  Presently before the Court is Defendant's [48] Motion for Summary Judgment

on all claims.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a

whole, the Court shall GRANT-IN-PART and DENY-IN-PART Defendant's Motion for

Summary Judgment.  The Court GRANTS summary judgment for the Defendant on Plaintiff's

Rehabilitation Act discrimination and retaliation claims entirely.  The Court GRANTS summary

judgment for the Defendant on Plaintiff's Rehabilitation Act failure to accommodate claim with

respect to Plaintiff's requests of telework; the end of pressure to retire, undergo a Performance

Improvement Plan, or endure any other pressure; and reassignment.  The Court DENIES

summary judgment on Plaintiff's failure to accommodate claim under the Rehabilitation Act with

respect to Plaintiff's request for a change in work assignments, as genuine disputes of material

fact preclude summary adjudication of that claim.

## I.  PROCEDURAL BACKGROUND

Plaintiff was an employee of the FDIC before retiring on October 31, 2018.  *See* Def.'s

Exs. 28; 29.  Prior to his retirement, Plaintiff contacted an FDIC Equal Employment Opportunity

---

[2] The Court's consideration has focused on the following documents and their attachments and/or exhibits:

- Pl.'s Compl., ECF No. [1] ("Compl.");
- Def.'s Mot. for Summ. J., ECF No. [48] ("Def.'s Mot.");
- Def.'s Statement of Undisputed Material Facts, included in ECF No. [48] ("Def.'s Statement);
- Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. [50] ("Pl.'s Opp'n");
- Pl.'s Statement of Genuine Issues, included in ECF No. [50] ("Pl.'s Statement);
- Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. [51] ("Def.'s Reply");
- Additional exhibits that Defendant provided upon the Court's request, ECF No. [52] ("Def.'s Ex. Updated 36"; "Def.'s Ex. Updated 37").

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

(EEO) officer on July 13, 2018 with complaints of alleged discrimination.  Def.'s Ex. Updated 36.  Plaintiff participated in the FDIC's EEO mediation program, which was not successful in resolving his claims.  Def.'s Ex. 38.  He then filed a formal complaint of discrimination with the FDIC on October 17, 2018.  Def.'s Ex. Updated 37.  On November 2, 2018, the FDIC Office of Minority and Women Inclusion (OMWI) accepted the following claims for investigation: (1) whether Plaintiff was denied a reasonable accommodation for his disabilities; (2) whether Plaintiff was discriminated against on the basis of retaliation for requesting a reasonable accommodation when placed on a Performance Improvement Plan; (3) whether Plaintiff was discriminated against on the basis of retaliation for requesting a reasonable accommodation when issued a Notice of Proposed Suspension; and (4) whether Plaintiff was discriminated against on the basis of disability and retaliation when he was "forced to involuntarily retire from employment".  Def.'s Ex. 38.  The FDIC OMWI issued a Report of Investigation on April 19, 2019.  Compl. at 3.

Plaintiff filed this action with the Court on May 17, 2019.  *See generally id.*  Plaintiff brought a Rehabilitation Act failure to accommodate claim, arguing that Defendant denied him the following reasonable accommodations for his disability: a change in assignments; permission to telework; the end of pressure to retire, undergo a Performance Improvement Plan, or other pressure that worsened Plaintiff's disability; and reassignment.  *See id.* ¶ 17; Pl.'s Opp'n at 17–20.  Plaintiff also brought a Rehabilitation Act discrimination claim based on disability for being persistently assigned work he was not able to perform.  *See* Compl. ¶ 18; Pl.'s Opp'n at 1, 14–17.  Finally, Plaintiff brought a Rehabilitation Act retaliation claim, arguing that Defendant retaliated against him for filing a request for reasonable accommodation by placing him on a Performance

Improvement Plan, issuing a Notice of Proposed Suspension, and threatening to fire him and withhold his pension.  *See* Compl. ¶ 19.

After engaging in discovery, Defendant FDIC filed a Motion for Summary Judgment on December 30, 2021.  The parties have briefed the motion, now ripe for consideration by this Court.

The Court notes that Plaintiff failed to comply with Local Civil Rule 7(h) in its Statement of Genuine Issues.  Local Civil Rule 7(h) requires "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h).  The Court emphasized that it "strictly adheres to the dictates of Local Civil Rule 7(h)" in the Order posted on August 26, 2021.  ECF No. 45.

Instead of providing a concise statement, Plaintiff offered additional information—at times very lengthy—that was not responsive to Defendant's Statement of Material Facts and did not raise genuine issues necessary to be litigated. Plaintiff also made legal arguments, going so far as to cite case law and federal regulations.

Plaintiff's deviation from Local Civil Rule 7(h) undermines the purpose of the Rule, which is to assist the Court in quickly determining if any facts are actually in dispute. *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996) ("[R]epeatedly blending factual assertions with legal argument… does not satisfy the purposes of [Rule 7(h)].").  Here, the Court was left with the task of discerning what material facts were embedded in Plaintiff's paragraphs and, of those, which presented a potential dispute. In its analysis, the Court did not rely on any legal arguments made by Plaintiff in their Statement

of Genuine Issues, as the pleading, properly presented, would have included only factual

assertions.

## II. STATEMENT OF FACTS

This Statement of Facts includes undisputed and unrebutted facts.  Mr. Congress began

his employment with the FDIC in 1991; he was promoted to the position of Chief, Operations

and Technology Systems in the Division of Consumer Protection (DCP), in 2011.  Def.'s

Statement ¶ 1.  In this position, Mr. Congress supervised the employees responsible for

performing the work of the DCP Internet Coordinator.  *Id.*  In September 2016, Mr. Congress

requested a "voluntary downgrade" due to his "health condition."  *Id.* ¶ 2.  He was reassigned to

the position of DCP Information Management Analyst, *id.* ¶ 3, which he began on October 3,

2016, Pl.'s Opp'n at 14.  Mr. Congress was on detail to Corporate University from October 3,

2016 through December 1, 2016, during which time he successfully "contributed to three

projects."  Pl.'s Ex. 4.  In December 2016, Mr. Congress began treatment for "generalized

anxiety disorder as well as depression."  Pl.'s Ex. 10; Pl.'s Ex. 14.

Upon return from the Corporate University detail, Mr. Congress was told he would be

assigned to "technical work and that he was expected to independently design, develop and

enhance web content changes and solutions for both the Intranet and Internet."  Pl.'s Ex. 12 at 3.

This role was referred to as DCP "Internet Coordinator."  Def.'s Statement ¶ 6.  In this role, Mr.

Congress's first line supervisor was Cristal Perpignan and second-line supervisor was Nikita

Pearson.  *Id.* ¶ 7.  Mr. Congress was "given 4 months without any Internet/Intranet assignments

to just learn CQ," including attending Adobe CQ training, reviewing CQ aides, and having one-

on-one and desk-side training.  Def.'s Ex. 33.  This training was extended after Mr. Congress

expressed that "he was not adequately prepared for independent work."  Def.'s Ex. 11.

In March 2017, Ms. Perpignan approved a flexible work schedule for Mr. Congress after receiving a report from Mr. Congress's doctor regarding his depression and anxiety.  Def.'s Statement ¶ 8; Pl.'s Statement ¶ 8.  In May 2017, Mr. Congress was assigned a project to redesign pages on the FDIC intranet.  Def.'s Ex. 11.  As of November 2017, Mr. Congress had "made no progress on [his] 1 and only assignment;" he "had not provided [Ms. Perpignan] any deliverables showing progress on this work."  Def.'s Ex. 33.  As a result, Mr. Congress received an overall job standards rating of "Improvement Required" for the performance rating period ending August 31, 2017.  Def.'s Ex. 11.  The narrative attached to the performance rating stated that "[d]uring the evaluation period, Mr. Congress failed to demonstrate the technical skills for his job and he failed to complete the work he was assigned, repeatedly failing to meet deadlines." *Id.*

Mr. Congress failed to meet all revised deadlines and produced no work product between November 2017 and January 2018.  Def.'s Ex. 10.  Ms. Perpignan therefore issued a Letter of Warning (LOW) to Mr. Congress on January 19, 2018 detailing his performance deficiencies.  *Id.* The LOW "warned [Mr. Congress] that failure to improve the performance outlined above within the next 45 days, failure to carry out the duties and responsibilities of your position in a fully satisfactory manner, or a further decline in your level of performance, could result in your being placed on a Performance Improvement Plan (PIP)."  *Id.*  Mr. Congress was next advised in his mid-year performance appraisal that his overall performance for the six-month period from September 1, 2017 to February 29, 2017 was rated "Unacceptable."  Def.'s Ex. 16.

On April 26, 2018, Mr. Congress's psychiatrist recommended that Mr. Congress "be[] excused from work the rest of this week and next… due to a stress reaction in response to the recent change in the nature of his work assignments."  Pl.'s Ex. 16.  Mr. Congress emailed Ms.

Perpignan the same day stating that "if I come in [to the office] I will be forced to disobey your order not to assign intranet work to z-inc." and that "I psychologically cannot do" the intranet assignments.  Def.'s Ex. 12.  He emailed Ms. Perpignan the following day saying, "I don't have the ability to do the work they are asking of me."  *Id.*  In response, Ms. Perpignan stated that "[w]hen you are back working you will be required to independently handle internet web requests and Internal Coordinator work as already assigned."  *Id.*

Mr. Congress filed a formal request for reasonable accommodation on May 21, 2018. Def.'s Ex. 14.  His request stated:

> I therefore request that I be provided Reasonable Accommodation in the following ways:
> - I am allowed to be an Internet Coordinator in the way that for most of the existence of DCP has been the role of the IC – to supervise coders/web developers with lengthy training and practice in the subject (Z.Inc, our small contract providers);
> - I continue to do the many other functions IC do throughout the Corporation. A number of other IC do NO coding (web page building or maintaining);
> - Permission to telework several days a week, as part of the treatment for my anxiety, panic attacks, and depression;
> - The end of pressure for me to retire, undergo a PIP, or endure other pressure that worsens my psychological conditions. I believe my attached Chronology of the past three years reinforces that my steady decline in PMP ratings has been directly related to the lack of support regarding my disabilities.

*Id.*  On June 5, 2018, Ms. Pearson responded to this reasonable accommodation request. Regarding Mr. Congress's first two requests, Mr. Pearson denied his request, writing that "[t]he CQ coding duties are an essential function of the position and cannot be removed."  Def.'s Ex. 15.  As for the third request, Ms. Pearson explained that because Mr. Congress had "not provided medical documentation to support a medical need for telework,… more information is required and a review from the Federal Occupational Health Service (FOH) is necessary before a determination can be made."  *Id.*  Regarding Mr. Congress's last request, Ms. Pearson wrote that

it was "not considered a reasonable accommodation request because they do not outline an accommodation which would allow you to perform the essential functions of your position; therefore a decision cannot be granted.  A reasonable accommodation does not prevent your supervisor from exercising discretion in evaluating your work or performance of your job."  *Id.*

Two days later on June 7, 2018, Mr. Congress was placed on a Performance Improvement Plan.  Def.'s Ex. 16.  The PIP stated that "[a]t the conclusion of the 45-day LOW period on March 2, 2018, [Ms. Perpignan] found that [Plaintiff's] performance had declined further and was unacceptable" in various performance standard categories, and that the PIP was put in place "to correct the deficiencies in [Plaintiff's] performance."  *Id.*  The PIP was extended by three weeks to "allow for additional time for [Plaintiff] to demonstrate [his] ability to perform at the Accomplished Practitioner level."  Def.'s Ex. 17.

On July 2, 2018, the FDIC responded to a request for reconsideration that Mr. Congress had submitted regarding his request for reasonable accommodation.  Def.'s Ex. 19.  The FDIC stated that reconsideration of Mr. Congress's telework request would be "premature because Ms. Pearson did not issue a decision on this request pending the receipt of medical documentation."  *Id.*  On July 5, 2018, Mr. Congress provided signed authorizations to allow the FOH to speak to his treating physicians.  Def.'s Mot. at 7.  On July 12, 2018, Ms. Perpignan emailed Mr. Congress stating that "[d]uring the pendency of the process of having your reasonable accommodation request reviewed by OMWI and considered by the Agency, I will allow you to telework on a case-by-case basis."  Def.'s Ex. 21.  On July 27, 2018, the FOH sent a letter to the Reasonable Accommodation Coordinator (RAC) indicating that Mr. Congress would benefit from teleworking up to three days per week.  Def.'s Ex. 22.  Ms. Pearson granted Mr. Congress's telework request on August 9, 2018, writing that he was "authorized one day per week of

regularly scheduled telework" and may "request up to two additional days of telework per week as-needed." Def.'s Ex. 23.

In the same email, Ms. Pearson wrote that "[y]ou have, on several occasions, stated that you are not able to perform certain essential functions of your position due to your medical conditions regardless of the location where you perform your work. Consequently, I believe that reassignment should also be considered as a potential reasonable accommodation." *Id.* She directed Mr. Congress to send a resume to the RAC, *id.*, which Mr. Congress did the following day, Def.'s Ex. 44. An email from the RAC to another member of the FDIC staff on August 15, 2018 indicated that "[t]he FDIC is currently processing a reassignment as a reasonable accommodation" for Mr. Congress and provided specific instructions to HR offices nationwide. Def.'s Ex. 24. On September 24, 2018, Mr. Congress told the RAC that he was "amenable for a downgrade… if there is something possible there." Pl.'s Ex. 13.

In a status memorandum issued on September 25, 2018, Ms. Perpignan wrote that Mr. Congress's "performance during the PIP period was unacceptable." Def.'s Ex. 17. On October 4, 2018, Mr. Congress was issued a Notice of Proposed Suspension (NPS) based on "failure to follow instructions" related to communications about his CQ assignments. Def.'s Ex. 25. In the NPS, Ms. Perpignan wrote that the penalty would only be served "[i]f a decision is made to suspend [Plaintiff]." *Id.* There was never a decision as to the suspension. Def.'s Ex. 41 ¶ 30(a).

On October 5, 2018, the RAC emailed Mr. Congress stating that "HR in HQ and the Regions are still evaluating all potential vacancies." Def.'s Ex. 26. The RAC emailed Mr. Congress again on October 16, 2018, stating that "[t]he process of reviewing vacant positions is continuing for the reassignment as a reasonable accommodation. I will be in touch with you again once I have information to share on the search results." Def.'s Ex. 27. On October 25,

2018, Mr. Congress notified the FDIC that he intended to retire from his position effective October 31, 2018.  *See* Def.'s Exs. 28; 29.

### III.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor.  *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251–52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution."  *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*).  Be that as it may, the plaintiff is not relieved of his burden to support his allegations with competent evidence.  *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009) (ESH).  As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage they bear the burden of production to designate specific facts showing that there exists a genuine dispute requiring trial.  *Ricci v. DeStefano*, 557 U.S. 557 (2009).  Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary

judgment device—namely, "to weed out those cases insufficiently meritorious to warrant…

trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene v.*

*Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  DISCUSSION

**A. Rehabilitation Act**

The Court now analyzes Plaintiff's claims brought under the Rehabilitation Act: first,

failure to accommodate, and second, discrimination and retaliation.

### 1.  Failure to Accommodate

The Rehabilitation Act, which incorporates the standards of the Americans with

Disabilities Act, requires federal employers to provide "reasonable accommodations to the

known physical or mental limitations of an otherwise qualified individual with a disability ...

unless [the employer] can demonstrate that the accommodation would impose an undue hardship

on the operation of the [employer's] business."  42 U.S.C. § 12112(b)(5)(A).  To avoid summary

judgment, a plaintiff must present sufficient evidence to allow a reasonable jury to conclude that:

(i) the plaintiff had a qualifying disability within the meaning of the Rehabilitation Act; (ii) their

employer had notice of their disability; (iii) they were able to perform the essential functions of

their job with or without reasonable accommodation; and (iv) their employer denied their request

for a reasonable accommodation of that disability.  *Solomon v. Vilsack*, 763 F.3d 1, 15 (D.C. Cir.

2014).  "If the plaintiff establishes a prima facie case of failure to provide reasonable

accommodation, then it is up to the employer to demonstrate that the accommodation would

have imposed an undue burden on its business; the ultimate burden, however, remains with the

plaintiff."  *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 77 (D.D.C. 2021) (ABJ); *see also Barth v.*

*Gelb*, 2 F.3d 1180, 1185–86 (D.C. Cir. 1993) (explaining that the burden-shifting framework of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), does not apply to reasonable accommodation claims and that such claims should be tested through the "application of traditional burdens of proof.")

Defendant does not contest that Mr. Congress was disabled under the Rehabilitation Act due to his anxiety, depression, and panic attacks nor that Defendant had notice of Mr. Congress's disability.  *See* Def.'s Mot. at 8.  However, Defendant argues that Mr. Congress was not able to perform the essential functions of his employment with or without reasonable accommodation, placing him outside the scope of the Rehabilitation Act's failure to accommodate protections. Defendant also argues that even if that were not the case, the FDIC did not deny him reasonable accommodations.  The Court addresses these two contested elements of the failure to accommodate claim: first, whether Mr. Congress was able to perform the essential functions of his employment position, and second, whether Defendant provided him reasonable accommodations.

### a.  Essential Function of Employment Position

Defendant first argues that Mr. Congress was not a "qualified individual with a disability" within the scope of the Rehabilitation Act's protections, *see* Def.'s Mot. at 12, because he was not able to perform the "essential functions" of his employment position with or without reasonable accommodation, 29 CFR § 1630.2(m).  Mr. Congress admits that he was unable to perform certain assignments in his role as DCP Internet Coordinator, specifically those requiring the use of Adobe CQ software to build and manage the DCP's internet and intranet pages, *see, e.g.*, Def.'s Ex. 12, but argues that those assignments were not an essential function of his position, *see, e.g.*, Pl.'s Opp'n at 16–17.  The pertinent question is therefore whether the Adobe CQ assignments were an essential function of Mr. Congress's employment position.

"Essential functions" is defined as "the fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1). The Code of Federal Regulations sets out that

> [e]vidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

*Id.* § 1630.2(n)(3). "In determining whether a function is essential to a particular position, the Court is to grant the employer substantial deference." *Adams v. D.C.*, 50 F. Supp. 3d 47, 54 (D.D.C. 2014) (JEB) (citing *Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999)). While the question of "whether an individual is 'qualified' for a job may at times present a pure question of law to be resolved by the court,… it may also, as in this case, be a question of fact that must be resolved by a fact-finder at trial." *Swanks*, 179 F.3d at 934.

To begin, Plaintiff and Defendant disagree about the word "coding" in reference to Mr. Congress's Internet Coordinator assignments. Defendant argues that "there is a distinction between 'coding' and maintaining the web pages, which Plaintiff seems to equate." Def.'s Mot. at 14. Defendant points to Ms. Perpignan's affidavit stating that the Adobe CQ "software does not require coding," Def.'s Ex. 40, and Ms. Pope's testimony that "[y]ou do not have to use code to use Adobe CQ," Pl.'s Ex. 7; *see* Def.'s Mot. at 14, 14 n.5. However, Mr. Congress referred to his Adobe CQ assignments as "coding" both before and after this litigation commenced. *See, e.g.*, Def.'s Ex. 14 (referring to the work as "coding (web page building or maintaining)" in his request for reasonable accommodation); Pl.'s Ex. 3 (numerous mentions of "coding" in his declaration). Additionally, some individuals at the FDIC also referred to such assignments as

14

coding; for example, Ms. Pearson spoke of "CQ coding duties" in an email to Mr. Congress. Def.'s Ex. 15.  The Court therefore understands Mr. Congress to have used the term "coding" to refer to working on the Adobe CQ interface, although doing so may not have been technically accurate.  Accordingly, the Court finds unpersuasive any evidence the parties offer as to whether "coding"—phrased specifically as such—was an essential function of Mr. Congress's position because of the parties' differing use of the term and, in particular, Mr. Congress's use of the term to refer to his CQ assignments.

The Court now considers whether the Adobe CQ assignments were an essential function of Mr. Congress's position, looking at the types of evidence described in the Code of Federal Regulations.  First, as for "[t]he employer's judgment as to which functions are essential," 29 C.F.R. § 1630.2(n)(3)(i), Defendant is adamant throughout their briefs that the FDIC considered CQ assignments to be essential to Mr. Congress's role.  *See, e.g.*, Def.'s Mot. at 12–14.  For example, Defendant offers Ms. Perpignan's deposition testimony stating that "that work[3] is an essential function of [Mr. Congress's] job and… without the internet work, he… would not be performing the job that he was in."  Def.'s Ex. 8; *see* Def.'s Mot. at 3.

Both parties point to the "[w]ritten job description" for Mr. Congress's position.  *See* 29 C.F.R. § 1630.2(n)(3)(ii).  Mr. Congress held the position of Information Management Analyst, CG-301-14, in a role referred to as Internet Coordinator.  Def.'s Ex. 5; Def.'s Ex. 6.  Both Plaintiff and Defendant cite to the Position Description for Information Management Analyst, CG-301-14, with differing interpretations as to what the position entailed.  *See* Pl.'s Statement ¶ 4 ("There are issues of fact regarding Plaintiff's duties as Internet Coordinator"); Def.'s Ex. 7.

---

[3] "[T]hat work" presumably refers to Adobe CQ work, although Defendant only offers an excerpt of the transcript.

Defendant highlights language from the position description stating that the Internet Coordinator was "responsible for managing, and assisting in the development, implementation and enhancement of DCP information management systems" as well as "managing and providing management support for DCP's internal and external Internet web sites information, and coordinating the performance, direction, and completion of all the Division's efforts related to the development and ongoing maintenance of all Internet related projects." Def.'s Mot. at 13 (citing Def.'s Ex. 7). Plaintiff responds by asserting that "even a cursory review of Mr. Congress's Position Description… reveals no specification that as the Internet Coordinator he would be required responsible [sic] for CQ." Pl.'s Opp'n at 16. In their Statement of Genuine Issues, Plaintiff says, "Defendant has quoted just a small part of Plaintiff's Position Description." Pl.'s Statement ¶ 4. Plaintiff then includes the description in its entirety, which includes references to other types of work not related to the Internet or Intranet. *Id.*

The Court also considers the DCP Governance Plan, finding it akin to a written job description for the purposes of this analysis.[4] Defendant writes in their reply that "Plaintiff does not dispute that the DCP CQ Governance Plan assigned the DCP Internet Coordinator the 'responsibility for making complex change requests to the DCP intranet site, creating templates, activating pages, and testing pages for accessibility and functionality.'" Def.'s Reply at 6; Def.'s Ex. 32.

---

[4] The Court also takes into consideration the deposition testimony of Ebony Pope, who succeeded Mr. Congress as the DCP Internet Coordinator. *See* Pl.'s Ex. 7 at 32. Ms. Pope's testimony states that coding and web design was in the description of duties posted on USA Jobs as to the Internet Coordinator role. *Id.* at 44–46. Plaintiff mentions Ms. Pope's testimony in their briefing but does not explain how this support their argument; they only mention the testimony once in both their Opposition and Statement of Genuine Issues. *See* Pl.'s Opp'n at 5 ("Ms. Pope testifies that coding was in the job announcement for her detail…"). The Court considers Ms. Pope's testimony as additional evidence regarding the job description for the Internet Coordinator position.

Next, as for "[t]he amount of time spent on the job performing the function," 29 C.F.R. § 1630.2(n)(3)(iii), Defendant argues that Mr. Congress's "job duties had… been whittled down to tasks only involving the redesign of the DCP Supervision webpage," Def.'s Mot. at 14. Defendant cites to the Letter of Warning issued to Mr. Congress which stated that the "redesign of the Supervision Intranet Web Pages" was his "primary assignment," Def.'s Ex. 10, as well as emails from Ms. Perpignan to Mr. Congress stating "your assignment is to develop the Supervision Pages," Def.'s Ex. 41.  Ms. Perpignan's deposition statement that "without the internet work, [Mr. Congress]… would not be performing the job that he was in" also supports the idea that Mr. Congress was assigned to largely—if not only—CQ functions for at least part of his time as Internet Coordinator.  Def.'s Ex. 8.  On the other hand, Plaintiff argues that Mr. Congress performed and "was successful in carrying out the Project Management and Liaison aspects of his new CG-14 job," during his detail to Corporate University.  Pl.'s Statement ¶ 5 (citing Pl.'s Ex. 4).

Plaintiff presents evidence evincing the "[t]he work experience of past incumbents in the job." 29 C.F.R. § 1630.2(n)(3)(v).  Before his request for voluntary downgrade in 2016, Mr. Congress managed the Information Security and Technology Services Section, which included Internet Coordinators, for approximately five years.  Pl.'s Ex. 3 at 3–4.  Mr. Congress alleges that he had "knowledge of the duties of the Internet Coordinators who had worked for" him.  *Id.* at 4. He says that when he served as Internet Coordinator, he "was required to perform technical tasks that were not assigned to other FDIC Internet Coordinators and to perform tasks that were not previously the duties of an Internet Coordinator in the Operations & Technology Section."  *Id.* at 5.  "Previously at the FDIC, I had worked with Internet Coordinators and observed that they were not expected to have technical skills to work in Adobe CQ to maintain the website.  The

FDIC had technically trained coders and contractors who had done such work." *Id.* at 6. Defendant rebuts this evidence with an email from Mr. Congress on February 4, 2015. Regarding one of the Internet Coordinators he supervised, Mr. Congress wrote that "when the development of CQ for DCP Intranet pages is complete, [she] will be required to maintain the page, as the DCP Internet Coordinator."  Def.'s Ex. 30; *see also* Def.'s Reply at 6 ("Plaintiff did not address, let alone dispute, the FDIC's evidence that his predecessors, who were also his subordinates when he served as the supervisor over that unit, routinely performed these functions.").

Plaintiff also offers deposition testimony that the Court considers as evidence of "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3)(vii). First, Plaintiff presents the testimony of Leslie Bowie, Manager of Business Project Management, Division of Resolutions and Receiverships (DRR).  Pl.'s Opp'n page 16; *see* Def.'s Reply at 8, 8 n.4 (correcting Plaintiff's misidentification of Ms. Bowie's title).  Ms. Bowie indicated that the DRR Internet Coordinator has "within her job title… some responsibilities for managing and overseeing the administration of our Internet and intranet" but that there were "contractors that do the actual programming work to support the web pages."  Pl.'s Ex. 5 at 18–23.  Ms. Bowie answered in the affirmative to the question of whether "the actual coding and maintenance and web development is done by… contractors" rather than the DRR Internet Coordinator. *Id.* at 23. In reply, Defendant emphasizes that Ms. Bowie was describing the DRR Internet Coordinator position instead of the DCP Internet Coordinator Position.  *See* Def.'s Reply at 8.  Additionally, the role of the Internet Coordinator in the DRR was held by a Senior IT Specialist, whereas the role of the Internet Coordinator in the DCP was held by an Information Management Analyst. *See id.*; Pl.'s Ex. 5 at 7.

Reviewing all evidence analyzed in the light most favorable to the Plaintiff, the Court finds that whether Adobe CQ assignments were an essential function of Mr. Congress's employment position is a genuinely disputed material fact.  The Court holds that on the one hand, a jury could view the CQ assignments to be an essential function of Mr. Congress's position, in which case Mr. Congress would be outside the scope of the Rehabilitation Act's protections as to his failure to accommodate claim, and his claim would therefore fail.  On the other hand, a jury could view the CQ assignments to *not* be an essential function of Mr. Congress's position, in which case Mr. Congress would be within the scope of the Rehabilitation Act's protections and the FDIC would have had to provide reasonable accommodations.

Assuming *arguendo* that the CQ assignments were not an essential function of Mr. Congress's employment position, the Court proceeds to discuss whether Defendant denied Mr. Congress reasonable accommodations.  As the following section demonstrates, the Court finds that Defendant did not deny all but one of Mr. Congress's requested accommodations—meaning that Mr. Congress's failure to accommodate claim is doomed as to all but one request.  Therefore, the previously discussed dispute about the essential functions of Mr. Congress's employment position is only pertinent as to one of his requested accommodations.

### b.  Reasonable Accommodations

The Court now considers the second contested element of Plaintiff's failure to accommodate claim: whether Defendant denied Plaintiff reasonable accommodations.

"An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).  Hence, "[t]o create an issue for the jury," plaintiff must point to "sufficient evidence" in the record showing that they requested

an accommodation and "that, after the request, [defendant] refused to make an accommodation." *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308 (D.C. Cir. 2010); *see Edwards v. U.S. EPA*, 456 F. Supp. 2d 72, 102 (D.D.C. 2006) (JDB) ("[T]he dispositive issue is whether [plaintiff] requested and was denied an accommodation.").

As for the accommodation itself, "the employee has the burden of identifying reasonable accommodations." *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 126 (D.D.C. 2009) (HHK) (citing *Chinchillo v. Powell*, 236 F. Supp. 2d 18, 23–24 (D.D.C. 2003) (PLF)). A reasonable accommodation is defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). In order to determine an appropriate reasonable accommodation, the employer should "initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation," which "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* § 1630.2(o)(3). "[A]n employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Aka*, 156 F.3d at 1305. The Court of Appeals has held that "[d]etermining whether a particular type of accommodation is reasonable is commonly a contextual and fact-specific inquiry." *Solomon*, 763 F.3d at 9. "The plaintiff bears the burden to show that the requested accommodation is reasonable on its face—the sort of accommodation that normally occurs." *Morris v. Jackson*, 994 F. Supp. 2d 38, 47 (D.D.C. 2013) (citation omitted). "When a plaintiff can make that showing, the defendant must demonstrate special circumstances that the

accommodation would impose an undue hardship." *Id.* "Undue hardship" constitutes "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A).

Here, Plaintiff submitted a request for reasonable accommodation to the FDIC on May 21, 2018, asking for the following accommodations: a change in assignments as Internet Coordinator, such that he did not have to do Adobe CQ assignments; "[p]ermission to telework several days a week;" and "[t]he end of pressure for me to retire, undergo a PIP, or endure other pressure that worsens my psychological conditions." Def.'s Ex. 14. Upon prompting by Ms. Pearson, Mr. Congress pursued reassignment as a reasonable accommodation as well. *See* Def.'s Exs. 23; 27. The Court addresses these in turn.

### i. Change in Assignments

The language of Mr. Congress's request for reasonable accommodation states that he

> request[s] that [he] be… allowed to be an Internet Coordinator in the way that for most of the existence of DCP has been the role of the IC – to supervise coders / web developers with lengthy training and practice in the subject (Z. Inc, our small contract providers); I continue to do the many other functions IC do throughout the Corporation. A number of other IC do NO coding (web page building or maintaining).

Def.'s Ex. 14. The Court summarizes this request to be seeking a change in assignments such that Mr. Congress did not have to perform CQ assignments. On June 5, 2018, Ms. Pearson denied this request, writing that "[t]he CQ coding duties are an essential function of the position and cannot be removed." Def.'s Ex. 15.

As explained earlier, the Court only reached this question of reasonable accommodation after determining that a jury could find that the Adobe CQ assignments were *not* an essential function of Mr. Congress's employment position. Accordingly, the Court considers Plaintiff's CQ assignments to be a marginal function of his position for the sake of this analysis. *See* 29 C.F.R. § 1630.2(n)(1) ("The term 'essential functions' does not include the marginal functions of

the position"); *Reagan-Diaz v. Sessions*, 246 F. Supp. 3d 325, 341 n.5 (D.D.C. 2017) (BAH) ("Essential job functions are the 'fundamental job duties' of an employee's position, and they include all but the 'marginal functions' of a job.").

"[T]he Rehabilitation Act, through its incorporation of the Americans with Disabilities Act's standards, see 29 U.S.C. § 791(g), is explicit that a 'reasonable accommodation' may include 'job restructuring'…. 42 U.S.C. § 12111(9)(B)." *Solomon*, 763 F.3d at 18. "An employer… may restructure a job by reallocating or redistributing nonessential, marginal job functions." 29 C.F.R. Pt. 1630, App. § 1630.2(o). More specifically, an employer "may redistribute the marginal functions so that all of the marginal functions that the individual with a disability can perform are made a part of the[ir] position," and those that the individual with a disability cannot perform are transferred to another employee. *Id.* As applied here, the FDIC could have redistributed the Adobe CQ assignments to other employees while assigning to Mr. Congress other functions of his position that he was able to perform. *See* Pl.'s Opp'n at 18 ("Mr. Congress was able to perform the Project Management and Liaison aspects described in his Position Description.").

Defendant FDIC has the burden of demonstrating that such an accommodation would have imposed an undue burden. *See Bonnette*, 907 F. Supp. 2d at 77. Defendant correctly states that "[a]n accommodation may be unreasonable 'if it either imposes undue financial and administrative burdens'… or requires 'a fundamental alteration in the nature of [the employer's] program.'" *Taylor v. Rice*, 451 F.3d 898, 908 (D.C. Cir. 2006) (quoting *Sch. Bd. of Naussau Cty. v. Arline*, 480 U.S. 273, 288 n.17 (1987)). Employers can demonstrate undue hardship if the requested accommodation "requires significant difficult or expense" in light of "the nature and cost of the accommodation,… and the composition, structure, and functions of the employer's

workforce." *Taylor*, 451 F.3d at 908 (cleaned up). "An employer invoking the undue hardship defense must… 'show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Id.* (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002)).

Here, Defendant states that "Plaintiff sought to have management reimagine his position" and that "management was not required to fundamentally alter the nature of the [] Information Analyst Position to suit Plaintiff's needs." Def.'s Mot. at 18. However, as stated previously, the Court is conducting this analysis assuming *arguendo* that a jury could find the CQ tasks to *not* be an essential function of Mr. Congress's job, meaning that such assignments were a marginal function. Beyond Defendant's argument that changing Mr. Congress's assignments would "fundamentally alter" the program because doing so would be removing essential functions of his position, they offer no further evidence—and certainly not evidence of special, case-specific circumstances—of undue burden. The Court also notes that the FDIC had contractors, including Z-Inc., who were equipped to perform the Adobe CQ assignments. *See* Pl.'s Opp'n at 18; Def.'s Statement ¶ 14 (citing to an email from Plaintiff that demonstrates he was capable of "assign[ing] intranet work to z-inc").

The Court has found that there is a genuine dispute as to whether the FDIC's failure to change Mr. Congress's assignments denied him a reasonable accommodation. Accordingly, the Court finds that summary judgment is not appropriate on Plaintiff's failure to accommodate claim under the Rehabilitation Act with regards to his request for a change in work assignments.

### ii.  Telework

For the rest of Mr. Congress's requested accommodations, the dispute regarding whether CQ assignments were an essential function of his employment position has no bearing, as the

Court finds that Defendant did not deny the requested accommodations.

Mr. Congress's request for reasonable accommodation also included a request to "telework several days a week."  *See* Def.'s Ex. 14.  The FDIC denied this request on June 5, 2018; Ms. Pearson explained that because Mr. Congress had "not provided medical documentation to support a medical need for telework,… more information is required and a review from the Federal Occupational Health Service (FOH) is necessary before a determination can be made."  Def.'s Ex. 15.  After Mr. Congress began the process of providing such documentation on July 5, 2018, Def.'s Mot. at 7, Ms. Perpignan notified Mr. Congress on July 12, 2018 that he would be allowed to "telework on a case-by-case basis" in the interim, Def.'s Ex. 21.  Ms. Pearson granted Mr. Congress's telework request on August 9, 2018, writing that he was "authorized one day per week of regularly scheduled telework" and may "request up to two additional days of telework per week as-needed."  Def.'s Ex. 23.  Plaintiff does not dispute this fact.  Pl.'s Opp'n at 19.

As explained above, an employer must have denied the employee's reasonable accommodation request to constitute an actionable claim.  *Flemmings*, 198 F.3d at 861.  Here, the FDIC did not deny Mr. Congress's requested accommodation of telework—rather, they granted it on August 9, 2018.  The FDIC was justified in waiting to make their decision until after Mr. Congress provided medical documentation, as "[a]n employer is not required to provide an accommodation prior to receiving medical documentation that substantiates the employee's need for accommodation."  *Graffius*, 672 F. Supp. 2d at 130.

The Court of Appeals has noted that "there are certainly circumstances in which a 'long-delayed accommodation could be considered' unreasonable and hence 'actionable.'"  *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010)).  "Courts in this jurisdiction weigh several

factors to determine whether a delay is unreasonable, including the length and reasons for the delay and whether the employer offered any alternative accommodations while evaluating the request." *Tobey v. U.S. Gen. Servs. Admin.*, 480 F. Supp. 3d 155, 169–70 (D.D.C. 2020) (APM). Courts in this Circuit have held that a delay of three years would violate the Rehabilitation Act. *Id.* at 170; *see also Leiterman v. Johnson*, 60 F. Supp. 3d 166, 181 (D.D.C. 2014) (CKK) (delay of up to three years was held as unreasonable).  On the other hand, "[a] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support such a claim," *Marks v. Wash. Wholesale Liquor Co. LLC*, 253 F. Supp. 3d 312, 324 (D.D.C. 2017) (JEB) (collecting cases), and "a four- or six-month wait is not inordinate time" and therefore not unreasonable, *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 72 (D.D.C. 2019) (TNM); *see also Tobey*, 480 F. Supp. 3d at 170 (six-week delay not unreasonable); *Matos v. DeVos*, 317 F. Supp. 3d 489, 499 (D.D.C. 2018) (CRC) (delay of nearly two years was held as reasonable).

Mr. Congress experienced a delay of, at the most, eighty days—the time between his request on May 21, 2022 and the accommodation being granted on August 9, 2022—and, more conservatively, thirty-five days—the time between when he provided the required medical documentation on July 5, 2022 and the accommodation being granted on August 9, 2022.  These delays are well within the range that other courts in this Circuit have found to be reasonable. Additionally, the FDIC's reason for delay was that they were waiting for required medical documentation from Mr. Congress, Def.'s Ex. 15, and they provided Mr. Congress with an interim accommodation, Def.'s Ex. 21.  Both of these facts counsel against a finding of unreasonableness.  *See Tobey*, 480 F. Supp. 3d at 169–70.

Therefore, the Court grants summary judgment for the Defendant as to Plaintiff's failure to accommodate claim under the Rehabilitation Act with respect to Plaintiff's telework request.

### iii.   "The End of Pressure to Retire, Undergo a PIP, or Endure Other Pressure that Worsens [Plaintiff's] Psychological Conditions"

In Mr. Congress's request for reasonable accommodation, he asked for "[t]he end of pressure for me to retire, undergo a PIP, or endure other pressure that worsens my psychological conditions."  Def.'s Ex. 14.  Ms. Pearson wrote that this was "not considered a reasonable accommodation request because they do not outline an accommodation which would allow you to perform the essential functions of your position; therefore a decision cannot be granted.  A reasonable accommodation does not prevent your supervisor from exercising discretion in evaluating your work or performance of your job."  Def.'s Ex. 15.

Plaintiff does not mention this request anywhere in their Opposition to Defendant's Motion for Summary Judgment.  Plaintiff also does not dispute anything related to this request in their Statement of Genuine Issues.  Pl.'s Statement ¶¶ 18, 22.  Therefore, Plaintiff fails to demonstrate a genuine dispute on this issue.

The Court grants summary judgment for the Defendant as to Plaintiff's failure to accommodate claim under the Rehabilitation Act regarding Mr. Congress's request as to "[t]he end of pressure for me to retire, undergo a PIP, or endure other pressure that worsens my psychological conditions."

### iv.   Reassignment

Finally, the Court considers Plaintiff's request for reassignment as a reasonable accommodation.  In Ms. Pearson's August 9, 2018 email to Mr. Congress approving his telework request, she suggested reassignment as a "potential reasonable accommodation."  Def.'s Ex. 23. Mr. Congress provided his resume to the RAC the following day, Def.'s Ex. 44, and the FDIC began "processing a reassignment as a reasonable accommodation" on August 15, 2018 by

"evaluat[ing] the vacant, funded positions at or below the employee's current CG-13 grade level

and identify[ing] which position where the employee meets the minimum qualifications;" this

was to continue "on an ongoing basis to ensure [they] have reviewed all open, vacant and funded

positions," Def.'s Ex. 24.  The RAC notified Mr. Congress on October 5, 2018 that "HR in HQ

and the Regions are still evaluating all potential vacancies."  Def.'s Ex. 26.  The RAC emailed

Mr. Congress again on October 16, 2018, stating that "[t]he process of reviewing vacant

positions is continuing for the reassignment as a reasonable accommodation.  I will be in touch

with you again once I have information to share on the search results."  Def.'s Ex. 27.  Plaintiff

does not dispute the content of these emails.  Pl.'s Statement ¶ 31.  However, they go on to say

that "by October 16, 2018, Mr. Congress had reasonably concluded that… he was not going to be

reassigned."  *Id.*  In their brief, Plaintiff writes that "on October 16, 2018, Mr. Congress was

informed that the FDIC, which has more than 5,500 employees, could not find a position for

him."  Pl.'s Opp'n at 11.  Plaintiff provides no evidence of this allegation.  To the contrary, as

stated above, the October 16th email indicated that the "process of reviewing vacant positions is

continuing."  Def.'s Ex. 27.  Then on October 25, 2018, Mr. Congress notified Ms. Perpignan

that he would be retiring effective October 31.  Def.'s Ex. 28.

To begin, a reasonable accommodation may consist of reassignment to a vacant position.

*Harris v. Chao*, 257 F. Supp. 3d 67, 76 (D.D.C. 2017) (RC).  An employee has "an obligation to

demonstrate that there existed some vacant position to which he could have been reassigned."

*Aka*, 156 F.3d at 1304 n.27; *see also Alston v. Wash. Metro. Area Trans. Auth.*, 571 F. Supp. 2d

77, 82 (D.D.C. 2008) (ESH) (plaintiff "must demonstrate that a reasonable accommodation was

possible and would have led to a reassignment position. … Thus plaintiff bears both the burden

of production and the burden of persuasion on the question whether a suitable vacancy existed at

the time [the employee] sought transfer.") (cleaned up).  An employer has "a corresponding

obligation to help [the employee] identify appropriate job vacancies."  *Aka*, 156 F.3d at 1304

n.27.  An employer does not have to reassign an employee to a position for which he is not

otherwise qualified, a position that would be a promotion, if reassignment would be an undue

hardship on the operation of the business of the employer, or if no vacant position exists;

furthermore, "employers are not required to 'bump' an employee, or create a new position" to

allow for reassignment.  *Aka*, 156 F.3d at 1305 (citing 42 U.S.C. § 12112(b)(5)(A); 42 U.S.C. §

12111(9)); *see Alston*, 571 F. Supp. 2d at 84.  "As a general matter, the employer has failed in its

obligation to attempt to reassign an employee where 'an employee [must] on his own initiative

appl[y] for a job on the same basis as everyone else.'"  *Butler v. Wash. Metropolitan Area Trans.*

*Authority*, 275 F. Supp. 3d 70, 85 (D.D.C. 2017) (CRC) (quoting *Aka*, 156 F.3d at 1304).

Plaintiff does not provide any evidence that there was an available vacant position to

which Mr. Congress could have been reassigned between when Ms. Pearson recommended

reassignment on August 9, 2018 and his notice of retirement on October 25, 2018.  Meanwhile,

the FDIC has demonstrated that they were working to help Mr. Congress identify job vacancies,

identifying and evaluating positions on an ongoing basis.  *See* Def.'s Exs. 24; 27.  As late as

October 16, 2018, the FDIC remained engaged in this process.  *See* Def.'s Ex. 27.

Accordingly, the Court grants summary judgment for the Defendant as to Plaintiff's

failure to accommodate claim under the Rehabilitation Act with respect to reassignment.

### c.  Interactive Process

The Court also considers, to the extent that Plaintiff intended to argue as such, the parties'

engagement in the interactive process.  Plaintiff does not plead with specificity that the FDIC

stopped engaging in good faith in the interactive process.  However, Plaintiff does make remarks

that could be considered as alleging such—at least with respect to telework and reassignment. *See, e.g.*, Pl.'s Opp'n at 20 (Mr. Congress "attests that rather than FDIC engaging in an interactive process with him to determine how to accommodate his disability, the telework status that he had recently been granted was abruptly terminated."); Pl.'s Statement ¶ 22 ("Defendant fails to acknowledge that if it had engaged in an interactive process, there was sufficient information to determine that Mr. Congress needed to telework because of his disabilities, and which he had been requesting since December 2016, was well documented."); Pl.'s Opp'n at 11 ("on October 16, 2018, Mr. Congress was informed that the FDIC, which has more than 5,500 employees, could not find a position for him.  However, the process to remove Mr. Congress was still ongoing.").  On the other hand, Defendant argues that "Plaintiff, not the FDIC, abandoned the interactive process by voluntarily retiring without waiting for the completion of FDIC's search for potential reassignment positions."  Def.'s Mot. at 17; *see also id.* at 1–2 ("Congress retired voluntarily while FDIC was still actively engaged in the interactive accommodation process.").

Once an employee requests a reasonable accommodation, the employer should engage in an "interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3).  "Both the employer and the employee have a duty to act in good faith." *Koch v. Schapiro*, 759 F. Supp. 2d 67, 76 (D.D.C. 2011) (JDS).  To demonstrate good faith, an employer can "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 41–42 (D.D.C. 2011) (RMU).  To

establish that a request for reasonable accommodation was denied, a plaintiff "must show either that the [employer] in fact ended the interactive process or that it participated in the process in bad faith." *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014).  Although "the interactive process is not an end in itself… if a jury could conclude that [an employer] failed to engage in good faith in the interactive process, and that failure led to [the employer] not according reasonable accommodations to [the employee] in a timely manner, summary judgment cannot be granted." *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005) (ESH).

Plaintiff fails to present evidence to raise a genuine dispute about the FDIC's good faith engagement in the interactive process.  With respect to Mr. Congress's telework request, the FDIC requested medical documentation to make its decision, which is a sign of employer's good faith.  *See Woodruff*, 777 F. Supp. 2d at 41; *see also Tobey*, 480 F. Supp. 3d at 169 (finding that an employer's timely request and evaluation of Plaintiff's medical documentation demonstrates continued engagement in the interactive process).  The FDIC then granted the requested accommodation after a reasonable delay, as discussed above.  As for Mr. Congress's reassignment request, the FDIC represented to Mr. Congress numerous times that they continued to evaluate reassignment options, stating on October 16, 2018 that "[t]he process of reviewing vacant positions is continuing."  Def.'s Ex. 27; *see Ward*, 762 F.3d at 33 n.3 ("Although we view the evidence in the light most favorable to [plaintiff], the letter [plaintiff] received… made clear that, whatever was said at the meeting, her accommodation request was still under consideration.").  Nine days later, Mr. Congress notified the RAC that he was retiring.  Def.'s Ex. 28.  The Court notes that in that email, Mr. Congress himself seems to acknowledge that the FDIC was continuing to pursue reassignment, stating "if by some miracle Reasonable Accommodation/HR's efforts to find me a position (even if a CG-12 or CG-13 downgrade) was

to bear fruit before the end of the month, I would want to rip up my retirement papers." *Id.*

Given this evidence, even when viewed in the light most favorable to Plaintiff, there is no

indication that Defendant FDIC stopped participating in the interactive process in good faith.

\*     \*     \*

Altogether, the Court grants summary judgment for the Defendant on Plaintiff's failure to

accommodate claims under the Rehabilitation Act for all but Mr. Congress's requested

accommodation of a change in work assignments, for which Court denies summary judgment.

## 2. Discrimination and Retaliation

### a. Failure to Exhaust Administrative Remedies

The Court is not persuaded by Defendant's argument that some of Plaintiff's

discrimination claims should be dismissed for failure to exhaust administrative remedies.  It is

undisputed that Mr. Congress contacted an FDIC EEO officer on July 13, 2018, filed a formal

complaint with the FDIC on October 17, 2018, and that the FDIC Office of Minority and Women

Inclusion (OMWI) accepted such complaint on November 2, 2018.  Def.'s Exs. 36; 37; 38.

However, Defendant states that the EEO complaint failed to sufficiently set out Plaintiff's claims

of disability discrimination other than failure to accommodate.  Specifically, Defendant writes

that only "in the instant matter" did the Plaintiff "raise[] allegations of discrimination on the

basis of disability when the FDIC 'mistreated' the Plaintiff, 'unfairly' placed him on a

Performance Improvement Plan, and threatened his pension in an effort to force him to retire."

Def.'s Mot. at 8 n.4.

The Court finds that Plaintiff's EEO complaint satisfied his exhaustion obligations by

putting Defendant on notice of these claims.  The test for determining whether a plaintiff

administratively exhausted his claims is whether he "timely provide[d] the [employer] with

31

'sufficient information to enable the agency to investigate the claim[s].'"  *Coleman v. Duke*, 867

F.3d 204, 210 (D.C. Cir. 2017) (quoting *Artis v. Bernanke*, 630 F.3d 1031, 1034–35 (D.C. Cir.

2011)).  Plaintiff did so here.  In his EEO formal complaint, Mr. Congress checked the boxes for

"reprisal" and "disability" and stated facts underlying his claims.  Def.'s Ex. 37; Def.'s Ex.

Updated 37.  He included, among other statements, that he was assigned to work with "technical

aspects that I am not trained or experienced in" with "no commercial training [] available to help

bring me up to speed." *Id.*[5]  Mr. Congress also provided facts in his EEO formal complaint that

he "was put on a PIP and failed to successfully complete it," noting that "I had no knowledge of

the area of work I was assigned to perform, no experience with it, and no training;" Mr. Congress

was also advised by a union representative "that at FDIC no one successfully gets through a

PIP." *Id.*  Finally, Mr. Congress wrote that management conveyed "threats of… a termination

(initial for cause with loss of pension) if I refused to accept [terms of resignation]" and,

elsewhere in his EEO formal complaint, that "if I did not agree, management would terminate

me… and I would loose [sic] my pension." *Id.*  Per a letter from the OMWI, "[d]uring informal

counseling and in his formal discrimination complaint, [Mr. Congress] indicated that he felt that

the alleged discrimination was driving him towards involuntary retirement." Def.'s Ex. 38.

Plaintiff's EEO complaint may not have connected specific incidents to legal theories of

discrimination, but the "EEO process… does not require more elaborate argumentation by

claimants," *Coleman*, 867 F.3d at 211, and "EEO complaints are to be liberally construed,"

*Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985).  "[T]he relevant inquiry is not whether the

complainant has filed a detailed statement spelling out precisely his objections but whether the

---

[5] The EEO Counselor's Report includes similar information, stating that Mr. Congress indicated
he "had little experience in and no training in" his new role." Def.'s Ex. Updated 36.

actions he did take were 'adequate to put the [agency] on notice.'"  *Id.* (quoting *President v. Vance*, 627 F.2d 353, 361 (D.C. Cir. 1980)).  Plaintiff's actions in this case were sufficient to put Defendant on notice regarding discrimination related to alleged mistreatment, being "unfairly" placed on a PIP, and threats to his pension in an effort to force him to retire.

At the very least, the claims that Plaintiff now pursues are sufficiently "like or reasonably related to" the issues accepted by the OMWI that the Court would allow Plaintiff's claim to go forward on the theory that the district court may consider claims "that are 'like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).

Lastly, a claim of failure to exhaust administrative remedies is an affirmative defense that a defendant has the burden of pleading and proving.  *Terveer v. Billington*, 34 F. Supp. 3d 100, 113–14 (D.D.C. 2014) (CKK).  Defendant FDIC only raised this defense in a footnote and did not cite to any evidentiary support.  *See* Def.'s Mot. at 8 n.4.  Exhibits relating to Plaintiff's administrative process, cited elsewhere in Defendant's motion, were selected excerpts of the records, prompting the Court to request complete versions of Plaintiff's EEO Formal Complaint and EEO Counselor's Report.  Defendant failed to meet its burden demonstrating that Plaintiff failed to exhaust administrative remedies.

For these reasons, the Court denies Defendant's request to dismiss Plaintiff's claims for failure to exhaust administrative remedies and will now consider whether Plaintiff's claims of disability discrimination and retaliation survive Defendant's motion for summary judgment.

### b.  Age Discrimination

The Court also briefly discusses an age discrimination claim under the Rehabilitation Act.

Plaintiff did not raise age discrimination in the Complaint, nor did Mr. Congress raise it throughout his administrative process before the Equal Employment Opportunity (EEO). *See* Pl.'s Compl.; Def.'s Ex. 37 (showing that Plaintiff did not select "Age" as a basis of allegations in his formal complaint of discrimination). But in Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff mentions—in only one instance—that "Defendant engaged in discrimination based on *age* and disability." Pl.'s Opp'n 1 (emphasis added). Nowhere else is age mentioned by the Plaintiff. To the extent that Plaintiff did intend to bring an age discrimination claim under the Rehabilitation Act, the Court grants summary judgment for the Defendant.

### c. Disability Discrimination and Retaliation

Finally, the Court turns to Plaintiff's claims of discrimination based on disability and retaliation under the Rehabilitation Act, which are subject to the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 16–17 (D.C. Cir. 2009). Pursuant to that framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination or retaliation. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). "[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's… disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). To establish a *prima facie* case of retaliation, a plaintiff must show that he (1) engaged in statutorily protected activity; (2) suffered a materially adverse action by the employer; and (3) there is a but-for causal link between the two. *See Solomon*, 763 F.3d at 14. After a *prima facie* case is established, the burden shifts to the defendant to produce a legitimate, non-discriminatory or non-retaliatory reason for its actions. *Id.* If provided, the

burden then shifts back to the plaintiff to prove that the defendant's proffered reason is pretextual.  *See id.*

Where a defendant has proffered a non-discriminatory or non-retaliatory rationale for their employment action, along with supporting evidence, it becomes "no longer relevant" if the plaintiff has established a *prima facie* case.  *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).  In fact, the Court of Appeals has dictated that this Court "need not—*and should not*—decide" whether the plaintiff has made out a *prima facie* case at this stage.  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).  Instead, the Court need only determine whether plaintiff has "produced sufficient evidence for a reasonable jury to find that the [defendant's] asserted non-discriminatory reason was not the actual reason and that [defendant] intentionally discriminated against [plaintiff] on the basis of" a protected status.  *Id.*  "In other words, the Court must determine if the plaintiff has produced enough evidence such that a reasonable jury would find that the [defendant's] non-discriminatory reasons are mere pretext for underlying unlawful discrimination."  *Perry v. Donovan*, 733 F. Supp. 2d 114, 118 (D.D.C. 2010) (RCL).

A plaintiff may make this showing of pretext by relying on "(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer."  *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006). "[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight," *Aka*, 156 F.3d at 1290, and this Court does not "require plaintiffs 'to submit evidence over and above rebutting the employer's stated explanation in order to avoid

summary judgment,'" *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka*, 156 F.3d at 1290 (D.C. Cir. 1998) (en banc)).

Here, Defendant FDIC has presented non-discriminatory and non-retaliatory reasons for their actions.  But although the Court's focus is on "the employer's proffered… reason, the Court still first must determine whether plaintiff has suffered an adverse employment action."  *Adesalu v. Copps*, 606 F. Supp. 2d 97, 103 (D.D.C. 2009) (PLF).

Accordingly, the Court first addresses alleged adverse employment actions in the context of both discrimination and retaliation claims, finding that only one action—placement on a Performance Improvement Plan—could be adverse.  Because Defendant has proffered a non-retaliatory rationale for placing Mr. Congress on the Performance Improvement Plan, the Court then considers whether Plaintiff has demonstrated pretext to survive summary judgment.

### i.   Adverse Employment Actions

"[N]ot everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).  For a discrimination claim, an adverse action must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Adverse actions within the context of a retaliation claim encompass a "broader sweep of actions" than for a discrimination claim.  *Baloch*, 550 F.3d at 1198 n.4; *see also Pardo-Kronemann v. Donovan*, 601 F.3d 599, 615 (D.C. Cir. 2010).  Actionable adverse actions are "not limited to discriminatory actions that affect the terms and conditions of employment" but instead may extend to harms that are not workplace-related or employment-related so long as "a reasonable employee would have found the challenged action materially adverse."  *Burlington N.*

*& Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006).  "In the retaliation context, instead of requiring a significant change in employment status to constitute adversity, an action is adverse if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Crowley v. Vilsack*, 236 F. Supp. 3d 326, 330 (D.D.C. 2017) (APM) (quoting *Burlington N.*, 548 U.S. at 68).  In determining whether a particular action would dissuade a reasonable worker from pursuing a charge of discrimination, courts look to the "particular circumstances" of the action so as to determine whether the adverse action resulted in an *objective harm* to the worker.  *See Burlington N.*, 548 U.S. at 68–69; *see also id.* at 68 ("We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective.").  "Whether a particular adverse action satisfies the materiality threshold is generally a jury question, with [the Court's] role limited to determining whether, viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find the action materially adverse."  *Rattigan v. Holder*, 643 F.3d 975, 986 (D.C. Cir. 2011), *vacated on other grounds*, No. 10-5014, 2011 WL 4101538 (D.C. Cir. Sept. 13, 2011).

Plaintiff offers four adverse actions, as articulated in the Introduction of Plaintiff's Opposition to Defendant's Motion for Summary Judgment: (1) being "deliberately and persistently assign[ed]" CQ assignments that Mr. Congress was not able to perform, in the context of a discrimination claim; (2) placement on a Performance Improvement Plan (PIP), in the context of a retaliation claim; (3) the Notice of Proposed Suspension (NPS), in the context of a retaliation claim; and (4) a threat to fire Mr. Congress—along with a threat to his pension—in the context of a retaliation claim.  *See* Pl.'s Opp'n 1–2.

### 1.  Discrimination Claim: CQ Assignments

"Failure to receive one's preferred work assignments for example, on its own, is not an

adverse action" in the context of a discrimination claim.  *Hunter v. Clinton*, 653 F. Supp. 2d 115,

121 (D.D.C. 2009) (PLF).  Specifically, an undesirable work assignment without "'any effect on

[the] salary, benefits, or grade' of [plaintiff's] employment or future employment opportunities"

is not an adverse action.  *Hunter*, 653 F. Supp. 2d at 121 (quoting *Blackmon-Malloy v. U.S.

Capitol Police Bd.*, 338 F. Supp. 2d 97, 106 (D.D.C. 2004) (EGS)).  The same is true for being

assigned "grunt work;" not being provided with on-the-job training; an employer's failure to

clarify expectations for work assignments, causing the employee to feel "severely stressed;" and

an employee's finding that a new assignment is "hard to complete."  *Stanton v. Potomac*, No. 20-

cv-2464, 2021 WL 4192149, at *12–13 (D.D.C. Sept. 15, 2021) (CRC); *Allen v. Napolitano*, 774

F. Supp. 2d 186, 200 (D.D.C. 2011) (JDB); *Shah v. Broad. Bd. of Governors*, No 18-cv-1328,

2020 WL 6342947, at *22 (D.D.C. Oct. 29, 2020) (RDM).

 Here, Plaintiff alleges that "a jury could find that Mr. Congress's FDIC managers

discriminated against him based upon his disabilities by assigning him technical duties he was

not able to perform."  Pl.'s Opp'n at 14.  Plaintiff cites to Mr. Congress's email to Ms. Perpignan

on April 27, 2018 saying, "I don't have the ability to do the work they are asking of me," and

Ms. Perpignan's reply that Mr. Congress would "be required to independently handle internet

web requests and Internal Coordinator work as already assigned."  Def.'s Ex. 12.  Plaintiff argues

that the CQ assignments were not an essential function of Mr. Congress's role and that his

"managers were not forthright in asserting that technical duties were a legitimate part of Mr.

Congress's duties… conceal[ing] a discriminatory intent in the treatment accorded Mr.

Congress."  Pl.'s Opp'n at 17.

 Plaintiff fails to establish an adverse action in the discrimination context.  The fact that

Mr. Congress was given work assignments that caused him difficulty and stress does not

constitute an adverse action absent any indication that his salary, benefits, or grade were impacted. This is true regardless of whether or not these assignments were an essential function of his position.

Accordingly, the Court grants summary judgment for the Defendant on Plaintiff's Rehabilitation Act discrimination claim as related to CQ assignments.

### 2.   Retaliation Claim: Performance Improvement Plan

"[C]ourts in this jurisdiction consistently have held that the imposition of a PIP—even one that does not result in a negative impact on salary, grade or performance appraisal—can constitute an adverse action" for a retaliation claim. *Crowley*, 236 F. Supp. 3d at 33; *see also Kelly v. Mills*, 677 F. Supp. 2d 206, 225 (D.D.C. 2010) (PLF) ("[P]lacement on a PIP… [is an] action[] that a reasonable person might well consider 'material' or 'significant' or would dissuade him from engaging in further protected activity"); *Hayes v. Sebelius*, 762 F. Supp. 2d 90, 108 (D.D.C. 2011) (RCL) ("[T]he Court concludes that [plaintiff's] PIP placement could dissuade a reasonable employee from pursuing a discrimination claim."). Furthermore, a performance improvement plan that exposes a plaintiff to removal, reduction in grade, or withholding of within-grade increase may be a materially adverse action.

Mr. Congress was placed on a Performance Improvement Plan on June 7, 2018. Pl.'s Opp'n at 20 (citing Def.'s Ex. 16). The PIP stated that "[t]o retain your position with the FDIC, it is essential that you correct the deficiencies noted and perform your work in accordance at the Accomplished Practitioner Standard." Def.'s Ex. 16. It continued that "[f]ailure to perform at the Accomplished Practitioner standard by the end of this PIP period may result in a recommendation for reassignment, demotion, or removal from your position." *Id.* Plaintiff does not dispute that there was no change to Mr. Congress's grade or salary as part of the PIP.

However, the PIP's strongly worded language threatened severe repercussions—up to losing his "position with the FDIC," *id.*—similar to language in PIPs that other courts in this Circuit have found to constitute an adverse action.  *See, e.g.*, *Kelly v. Mills*, 677 F. Supp. 2d 206, 217, 225–26 (D.D.C. 2010) (PLF) (finding that a PIP stating that the employee "need to improve his job performance in order to avoid 'reassignment, reduction in grade or removal from the Federal Service'" was an "adverse action[] for the purpose of plaintiff's retaliation claim."); *Hayes*, 762 F. Supp. 2d at 98, 108 (finding that a PIP that "state[d] that if [employee] did not improve his performance he could be terminated" "could dissuade a reasonable employee from pursuing a discrimination claim").  Therefore, the Court finds that there is a genuine dispute as to whether placement on the PIP would dissuade a reasonable employee from pursuing a charge of discrimination or engaging in otherwise protected activity, and accordingly, whether it was a materially adverse action for Mr. Congress's retaliation claim.

### 3.  Retaliation Claim: Notice of Proposed Suspension

The Court of Appeals has held that a proposed suspension that is not served does not constitute a materially adverse employment action for a retaliation claim. *Baloch*, 550 F.3d at 1199 ("courts have been unwilling to find adverse actions where the suspension is not actually served"); *see also Bowe-Connor v. Shinseki*, 923 F. Supp. 2d 1, 8 (D.D.C. 2013) (JDB); *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 62 (D.D.C. 2011) (JEB).  This Court has held that a Notice of Proposed Suspension that was not served by the plaintiff, and where the plaintiff did not allege any material or tangible harm suffered as a result of the proposed suspension, was not an adverse action for a retaliation claim. *Kangethe v. D.C.*, 206 F. Supp. 3d 661, 669 (D.D.C. 2016) (CKK) ("Plaintiff argues only that the charges against him were 'manufactured' and 'bogus,' and that the suspension was proposed in a 'callous manner.'… Even accepting these allegations as true,

however, they do not negate the fact that Plaintiff did not serve the proposed suspension, and thus suffered no material or tangible harm as a result of it.").

Mr. Congress was issued a Notice of Proposed Suspension on October 4, 2018.  *See* Pl.'s Opp'n at 22 (citing Def.'s Ex. 25).  In the NPS, Ms. Perpignan wrote that the penalty would only be served "[i]f a decision is made to suspend [Plaintiff]."  Def.'s Ex. 25.  There was never a decision as to the suspension, Def.'s Ex. 41 ¶ 30(a), and accordingly Mr. Congress never served the suspension.  Plaintiff does not dispute these facts.  Plaintiff also does not provide any evidence—in either their Opposition or Statement of Genuine Issues—that the NPS caused Mr. Congress any tangible harm.  Instead, Plaintiff points to *Gaujacq v. EDF, Inc.* for the proposition that "[a] threatening verbal statement, standing alone, might well constitute a materially adverse action" for a retaliation claim.  *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C. Cir. 2010).  While this may be true, it is inapposite in this context, where the law is clear that an unserved proposed suspension is not an adverse action.

Accordingly, the Court grants summary judgment for the Defendant as Plaintiff's claim of Rehabilitation Act retaliation related to the Notice of Proposed Suspension.

### 4.   Retaliation Claim: Threat to Terminate Plaintiff

"A long line of cases from this Circuit and others have held that threats… and other such ultimately unconsummated actions are not materially adverse for purposes of retaliation claims." *McNair v. D.C.*, 903 F. Supp. 2d 71, 75–76 (D.D.C. 2012) (JEB).  In the instances where courts *have* found a materially adverse action, it is "emphasize[d] that 'context matters,'"  *Gaujacq*, 601 F.3d at 578 (quoting *Burlington N.*, 548 U.S. at 69), and, specifically, that the employee must have "suffered a 'credible threat of termination,'" *Lawrence v. Lew*, 156 F. Supp. 3d 149, 165 (D.D.C. 2015) (KBJ) (quoting *Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 89 (D.D.C. 2011) (HHK)).

A plaintiff's "vague and self-serving testimony" and "bare assertions" cannot establish that such a threat is credible and materially adverse.  *Lawrence*, 156 F. Supp. 3d at 165.

Additionally, an employer's accommodation or support of the employee before and after the alleged termination threat "bolsters" a finding that the threat was not an adverse action. *Sorrell v. Paige Indus. Servs., Inc.*, No. 15-2004, 2021 WL 2156693, at *31 (D.D.C. May 27, 2021) (TJK) (noting employer "supported [employee] in many ways, including giving him a raise to recognize his good work, reimbursing him or the cost of [training courses], encouraging him to apply for the apprenticeship program, and sponsoring his application"); *see also Gaujacq*, 601 F.3d at 578 (employer "spent so much time earlier in the year negotiating with [the plaintiff] in an effort to accommodate her, which ultimately included "extending her contract by a year, then by negotiating with her to find a way to allow her to stay in [a given office location], and finally by creating a Vice President's position for her"); *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 124 (D.D.C. 2015) (RC) (noting that an employer "had personally dedicated substantial efforts to investigating the situation, resolving it, and supporting" the employee).

Plaintiff's only evidence regarding the alleged threats to terminate Mr. Congress takes the form of self-serving double hearsay.  In their Opposition to Defendant's Motion for Summary Judgment, Plaintiff writes that "[a]ccording to the union representative, [Mr. Congress's] supervisors were now claiming that Mr. Congress's earlier rather informal request for reasonable accommodation indicated that he could be violent, and they would be proposing that he agree to 'voluntarily' retire."  Pl.'s Opp'n at 8.  "The union representative further warned Mr. Congress that if he did not agree to such terms, his superiors would fire him for cause, and he would thus lose his pension altogether."  *Id.*  The only evidence supporting these assertions is Mr. Congress's own declaration, in which he alleges that in June 2018, a union representative told him that

management was planning on proposing that "if I would agree to 'voluntarily' retire… I would get my full pension upon retirement. However, the union representative also told me that if I did not agree to such terms, FDIC could fire me for cause in a manner that would cause me to forfeit my pension."  Pl.'s Ex. 3 ¶ 10; *see also id.* ¶ 14.  When deposed, Mr. Congress stated that he "do[esn't] remember who" at the union conveyed the message regarding management's threats to fire him, Def.'s Ex. 3 at 110, but that he "gained the impression from one or another union members that [being ineligible for his pension] was the case," *id.* at 113.

Plaintiff fails to demonstrate a materially adverse action here.  Plaintiff does not present evidence of a "credible" threat of termination but rather only "bare assertions of "vague and self-serving testimony," *Lawrence*, 156 F. Supp. 3d at 165, in the form of Mr. Congress's own declaration that has two layers of hearsay.  Mr. Congress relayed what a union representative said passing along a message from management but otherwise could not recall which union representative contacted him, provided minimal detail about what the union representative said, and stated only that he "gained the impression" that his pension would be at risk.  Def.'s Ex. 3.

While this lack of evidence would be enough to hold that Plaintiff has not demonstrated a materially adverse action, it is "bolster[ed]" by the fact that the FDIC supported and sought to accommodate Mr. Congress both before and after the alleged threat to terminate him in June 2018.  *Sorrell*, 2021 WL 2156693, at *31.  For example, in March 2017—before the alleged threat—Ms. Perpignan approved Mr. Congress's alternative work schedule, and then in August 2018—after the alleged threat—Ms. Pearson authorized Mr. Congress's telework request.  Pl.'s Statement ¶¶ 8, 26.  Furthermore, in August 2018 Ms. Perpignan suggested reassignment to a different position to accommodate Mr. Congress's disabilities, Def.'s Ex. 23, and the FDIC continued to evaluate vacant positions for reassignment up until late October 2018, Def.'s Ex. 27.

Accordingly, the Court grants summary judgment for the Defendant on Plaintiff's Rehabilitation Act retaliation claim related to the purported threats to terminate Mr. Congress and threats to his pension.

### ii. Pretext

As discussed above, there is a genuine dispute as to whether Mr. Congress's placement on the PIP was a materially adverse action for a Rehabilitation Act retaliation claim; the Court granted summary judgment for Defendant on all other retaliation and discrimination claims. Therefore, the Court will proceed with its analysis only as to Mr. Congress's retaliation claim related to the PIP.

To begin, the statutorily protected activity in which Mr. Congress engaged was filing a formal request for reasonable accommodation on May 21, 2018. *See* Pl.'s Opp'n at 1–2, 23; Def.'s Ex. 14. Plaintiff argues that Mr. Congress was placed on the PIP in retaliation for seeking the reasonable accommodation. Pl.'s Opp'n at 1–2.

Defendant FDIC has produced a non-retaliatory reason for placing Mr. Congress on the PIP: Mr. Congress's unsatisfactory job performance. Defendant extensively recounts Mr. Congress's performance leading up to placement on the PIP. This includes evidence of Mr. Congress's need for an extended training period, Def.'s Ex. 11; failure to meet project deadlines or demonstrate progress on assignments, Def.'s Exs. 10; 11; 33; negative performance ratings, Def.'s Exs. 11; 16; and a Letter of Warning stating that a failure to improve "could result in [Mr. Congress] being placed on a Performance Improvement Plan," Def.'s Ex. 10. The PIP stated that "[a]t the conclusion of the 45-day LOW period on March 2, 2018, [Ms. Perpignan] found that [Plaintiff's] performance had declined further and was unacceptable" in various performance standard categories. Def.'s Ex. 16.

Because Defendant has proffered a non-retaliatory rationale for placing Mr. Congress on the PIP, this Court must determine if Plaintiff has produced enough evidence to demonstrate pretext. Plaintiff offers two theories to suggest that FDIC's justification of Mr. Congress's poor performance was pretextual.

First, the Court takes Plaintiff's briefing to allege that the FDIC knew Mr. Congress could not perform the CQ work assigned to him,[6] knew he was doomed to fail the PIP as a result, and was therefore using the PIP as a way to push him out the door in retaliation for seeking the accommodation.[7] Plaintiff does not present sufficient evidence to support these allegations of pretext.

As for the allegation that the FDIC knew Mr. Congress could not perform the CQ work assigned to him, the only evidence the Court could find was the email from Mr. Congress to Ms. Perpignan stating "I don't have the ability to do the work they are asking of me." Def.'s Ex. 12. However, Plaintiff does not present any evidence of anyone at the FDIC stating that Mr. Congress was patently unable to perform the CQ work assigned to him in the PIP.

---

[6] As discussed previously, Plaintiff admits that he was unable to perform the assigned CQ work. Plaintiff contends that the CQ assignments were not an essential function of his position, as relevant for his failure to accommodate claim, which Defendant disputes.

[7] Plaintiff states that "[h]aving assigned Mr. Congress to duties he could not perform, his managers started the process to terminate his employment." Pl.'s Opp'n at 7-8. Plaintiff later states that when the PIP was issued on "June 7, 2018, it was obvious to both Ms. Perpignan and Mr. Congress that he was not able to meet this requirement [imposed by the PIP], and was therefore doomed to fail his PIP." *Id.* at 21. Plaintiff "[d]isputed as incomplete" Defendant's material fact as to Ms. Perpignan's September 25, 2018 notice that Mr. Congress's performance during the PIP remained unacceptable; they state that "it fails to mention… that it was obvious to both Ms. Perpignan and Mr. Congress that he was not able to meet this requirement [imposed by the PIP] and was [sic] therefore she was going to terminate Mr. Congress." Pl.'s Statement ¶ 29. Finally, Plaintiff states that "[a] reasonable jury could conclude that the employer's actions, such as placing an employee on a PIP that he had to pass to keep his job – but could not, telling him that he had failed the PIP… [is an] action[] that might well dissuade a reasonable worker from making or supporting a charge of discrimination." Pl.'s Opp'n at 23.

As for the allegation that the FDIC knew that Mr. Congress was doomed to fail the PIP, Plaintiff only offers Mr. Congress's allegation that his union representative told him "no one successfully gets through a PIP at the FDIC."  Pl.'s Opp'n at 8 (citing Pl.'s Ex. 3 at ¶ 10).  Again, they do not present any evidence of anyone at the FDIC stating that Mr. Congress would fail the PIP.  In fact, Ms. Perpignan extended Mr. Congress's PIP by three weeks "to allow for additional time for [Plaintiff] to demonstrate [his] ability to perform at the Accomplished Practitioner level," Def.'s Ex. 17, which the Court considers as showing the FDIC's efforts to help Mr. Congress pass the PIP.

Other evidence that Plaintiff offers as proof of the FDIC pushing Mr. Congress out the door by way of the PIP is from well before May 2018, when Mr. Congress's request for reasonable accommodation was filed.  *See, e.g.*, Pl.'s Opp'n at 8 (citing to a 2016 performance appraisal and email from November 2017).  Accordingly, Plaintiff's proffered evidence fails to demonstrate that the FDIC was certain of Mr. Congress's impending failure on the PIP and therefore used the PIP as a way to edge out Mr. Congress.  Furthermore, an employee's personal opinion as to an employer's assessment of the employee does not matter.  *See Walker v. Johnson*, 798 F.3d 1085, 1093 (D.C. Cir. 2015) (concluding that, "[i]n light of the other evidence in this case, including [the employee's] acknowledged absences and [her supervisor's] determination that her unreliable attendance was interfering with his ability to manage work flow, [the employee's] own personal opinion is inadequate by itself to create an issue for the jury" regarding a low performance rating and evaluation); *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("It is settled that 'it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d

274, 280 (4th Cir. 2000))).  Therefore, that Mr. Congress may have thought that the FDIC knew

he would be unsuccessful on the PIP does not persuade this Court.

Second, Plaintiff says "the exceedingly close temporal proximity and continuing nature

of actions against Mr. Congress is sufficient to infer a causal relationship exists between Mr.

Congress's protected activity and FDIC's actions against him."  Pl.'s Opp'n at 23.  Plaintiff is

right to point to temporal proximity—there were only seventeen days between Mr. Congress's

request for reasonable accommodation on May 21, 2018 and his placement on the PIP on June 7,

2018.  However, while "temporal proximity of an adverse action close on the heels of protected

activity is a common and highly probative type of circumstantial evidence of retaliation," *Allen v.

Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015), "temporal proximity alone is insufficient to establish

pretext," *Jeffries v. Barr*, 965 F.3d 843, 862 (D.C. Cir. 2020).

Plaintiff's temporal proximity argument is further "undermined by the undisputed fact

that" the FDIC considered taking the adverse action of placing Mr. Congress on the PIP before

his request for reasonable accommodation.  *Bonnette*, 907 F. Supp. 2d at 74.  Mr. Congress was

issued a Letter of Warning in January 2018 making him aware that "a further decline in your

level of performance, could result in your being placed on a Performance Improvement Plan

(PIP)."  Def.'s Ex. 10.  This was five months before he filed his formal request for

accommodation in May 2018.  *See* Def.'s Mot. at 26 (Defendant points to the "undisputed fact

that management had been actively engaged in ongoing efforts to address Plaintiff's

unacceptable performance for many months prior to his May 2018 request for accommodation,

including explicitly warning him that failure to improve may result in a PIP.").  It is well-

established that "[e]mployers need not suspend previously planned [actions] upon discovering

that a [protected activity was engaged in], and their proceeding along lines previously

contemplated, though not yet definitively determined, is no evidence whatever of causality."

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).  Accordingly, that the PIP came

right on the heels of Mr. Congress's request for reasonable accommodation does not establish

pretext, especially in light of the FDIC's pre-request warning that a PIP could be imposed.

   Finally, and perhaps most importantly, Plaintiff does not dispute the fact that he failed to

perform assigned tasks; rather, his inability and failure to perform CQ assignments makes up a

large part of Plaintiff's overall story.  In addition to quoting Mr. Congress's emails to Ms.

Perpignan saying he could not do the work, Pl.'s Statement ¶¶ 13, 16, 17, 20 (citing Def.'s Ex.

12), Plaintiff references Mr. Congress's "lack of aptitude and qualifications to do the actual

coding, web development and web maintenance," *id.* ¶ 12, and asserts that Mr. Congress "admits

that he was not able to complete the redesign" assigned to him, *id.* ¶ 13.  Where a plaintiff "does

not contravene—and in fact admitted—many of the deficiencies the defendants cited concerning

[the plaintiff's] performance, [they] fail[] to establish" pretext.  *Waterhouse v. D.C.*, 298 F.3d

989, 995 (D.C. Cir. 2002).  Courts in this Circuit have consistently held as such.  *See, e.g.*, *id.* at

994 (plaintiff did not establish pretext where she "admitted that she missed the deadlines" and

"[h]er only defense was that… she should have received greater support from outside

contractors"); *Ginger v. D.C.*, 527 F.3d 1340, 1346–47 (D.C. Cir. 2008) (plaintiffs failed to

demonstrate pretext to survive a motion for summary judgment where they "do not dispute" the

employer's justification for issuing a memorandum that put in place a new policy);  *McGrath v.*

*Clinton*, 666 F.3d 1377, 1384–85 (D.C. Cir. 2012) (cleaned up) (where plaintiff did not dispute

that he "failed to heed instructions" given to him and "failed to perform his assigned tasks," only

"offer[s] explanations for some of his actions, and he notes that he made useful contributions on

specific programs," the court found that plaintiff's deficiencies "constitute legitimate, non-

retaliatory reasons for the negative employment reviews [the employee] received" and that the plaintiff's "responses offer no grounds for a rational juror to conclude that the reason [he] was fired was [retaliation] rather than poor performance."). Additionally, the Rehabilitation Act does not "shield [an employee] from workplace discipline when his job performance falls short." *Tobey*, 480 F. Supp. 3d at 166; *see also Carr v. Reno*, 23 F.3d 525, 531 (D.C. Cir. 1994) (the court found the employer's termination of plaintiff justified where the plaintiff was often absent from work due to symptoms of her disability). Here, Plaintiff does not dispute that Mr. Congress did not complete the tasks assigned to him that led to his placement on the PIP, and any argument that his disabilities prohibited him from doing so would be unavailing.

The Court grants summary judgment for the Defendant as to Plaintiff's remaining Rehabilitation Act retaliation claim regarding placement on the Performance Improvement Plan.

\*     \*     \*

In sum, the Court grants summary judgment for the Defendant on all of Plaintiff's Rehabilitation Act discrimination and retaliation claims.

## B. Hostile Work Environment and Constructive Discharge

Lastly, Defendant addresses potential claims of hostile work environment and constructive discharge "[a]lthough not asserted as such" by Plaintiff. *See* Def.'s Mot. at 26, 32. Plaintiff does not respond to Defendant's arguments that both a hostile work environment and constructive discharge claims would fail. Plaintiff also has not provided any facts nor evidence to support such claims. Therefore, if Plaintiff intended to raise these claims, the Court grants summary judgment for the Defendant for both hostile work environment and constructive discharge claims as Plaintiff has not provided any facts or legal argument to support them.

## V.  CONCLUSION

For the reasons discussed above, the Court shall GRANT-IN-PART and DENY-IN-PART Defendant's Motion for Summary Judgment.  The Court grants summary judgment for the Defendant on Plaintiff's Rehabilitation Act discrimination and retaliation claims entirely.  The Court grants summary judgment for the Defendant on Plaintiff's Rehabilitation Act failure to accommodate claim with respect to Plaintiff's requests of telework; the end of pressure to retire, undergo a Performance Improvement Plan, or endure any other pressure; and reassignment.  The Court denies summary judgment on Plaintiff's failure to accommodate claim under the Rehabilitation Act with respect to Plaintiff's request for a change in work assignments, as genuine disputes of material fact preclude summary adjudication of that claim.  The only remaining claim is therefore Plaintiff's failure to accommodate claim regarding a change in work assignments.  An Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
